# EXHIBIT 1

FILED
2024 FEB 09 10:03 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 24-2-03133-2 KNT

IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

JANE KANG, an individual;

    Plaintiff,

vs.

THE BOEING COMPANY, a Delaware corporation;

    Defendant.

Case No.

COMPLAINT

1. Plaintiff Jane Kang was an exemplary employee of The Boeing Company. She began her career at Boeing as an attorney supporting its Defense, Space, and Security ("BDS") business unit. She was so highly regarded by the BDS executives whom she supported that she was asked to join the leadership team of a newly established division of BDS as an executive in BDS's Finance department ("BDS Finance").

2. Plaintiff, who had studied finance and business in graduate school, quickly began to leverage her financial acumen and expertise in contract financing mechanisms to drive significant improvements in the Commercial Derivative Aircraft ("CDA") division's financial performance. This in turn had a material impact on BDS's and Boeing's financials. Every quarter, her manager and the other BDS Vice Presidents most familiar

COMPLAINT - 1

WYATT GRONSKI
PLLC

ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

with her work showered her with praise. Their high regard for her accomplishments were reflected in annual performance scores that were even higher than the average of the scores she received as an attorney.

3. Despite her strong performance, as Plaintiff began her third year in BDS Finance, she discovered that the Chief Financial Officer of BDS ("BDS CFO") and its Chief Executive Officer ("BDS CEO") harbored racial animus towards her. Plaintiff only became aware of their animus after colleagues and subordinates began to tell her that she was being excluded from meetings scheduled by the BDS CFO. When Plaintiff raised these concerns with two BDS Finance VPs, one of the VPs pointed to Kang's race to explain why she was being mistreated, noting that Kang was the only Asian-American member of BDS CFO's extended leadership team in the United States.

4. Plaintiff attempted to ignore the hostility and efforts to marginalize and undermine her. And despite her strong performance, her employment was abruptly terminated without notice or explanation of any kind. The individuals who informed Plaintiff of her termination would not even tell her whether she was being laid off or fired. Additionally, Plaintiff and the managers who reported to her were instructed to tell their employees that Plaintiff had abruptly quit, without giving notice.

5. She now brings this Complaint to illuminate Boeing's illegal and wrongful termination of her employment and to seek compensation for the damages Boeing has inflicted.

## PARTIES, JURISDICTION, AND VENUE

6. Plaintiff is an individual residing in San Juan County. When she was employed by Boeing, she resided and worked in King County.

7. The Boeing Company is a Delaware company doing business in King County.

COMPLAINT - 2

WYATT GRONSKI
PLLC

ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

8. Jurisdiction and venue are proper in this Court pursuant to RCW 2.08.010, RCW 4.12.020, and RCW 4.12.025.

## FACTS

9. Plaintiff was hired by Boeing in 2010 as an attorney supporting a variety of military aircraft programs for a BDS division headquartered in the Puget Sound region of Washington. She the only Asian attorney in the BDS Puget Sound legal office. Prior to December 2016, she was also the only Asian executive assigned to the BDS division. At the time her employment with BDS was terminated, she was the only executive or, to her knowledge, manager (executive or non-executive) in the entire BDS Finance organization of East Asian descent.

10. As an attorney, Plaintiff received consistently excellent reviews and was credited with many significant accomplishments. For example, within a year of being assigned to a troubled program, Plaintiff was instrumental in resolving a matter that Boeing's CEO had identified as a "top 10" issue for the company. For her efforts, Plaintiff received direct praise from Boeing's General Counsel and senior Finance executives. She also received a performance rating that placed her in the top 5% of BDS attorneys. After Plaintiff successfully closed a monumental deal for BDS valued well in excess of $10 billion, the General Counsel for BDS thanked Plaintiff for "pull[ing] a rabbit out of the hat" to complete an historic and consequential deal for BDS ("I don't have to tell you how important this deal is for the future of BDS").

11. Plaintiff was so highly regarded by the BDS executives she worked with that, within days of a March 2018 BDS CEO announcement of her decision to establish CDA as a new BDS division to be headquartered in Seattle, the new VP & General Manager of the CDA

COMPLAINT - 3

WYATT GRONSKI
PLLC

ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

division ("CDA GM") asked the Plaintiff to join his leadership team as the division's new Contracts Director. CDA GM told Plaintiff that he had the full support of BDS's Acquire (Contracts, Pricing & Estimating) VP ("Acquire VP"). Soon after Plaintiff's discussion with CDA GM, Acquire VP informed Plaintiff that her transfer to BDS Finance had been approved by Boeing's General Counsel and Chief Financial Officer. Acquire VP also informed her that her responsibilities would be broader than the Contracts role that CDA GM had asked her to consider because BDS CFO had decided that the Contracts Directors for each of BDS's divisions should also assume responsibility for the Estimating teams assigned to their respective divisions. Accordingly, Plaintiff's new title would be Acquire Director and she would soon assume responsibility for CDA's Contracts and Estimating teams at six sites in Washington, Texas, and Oklahoma. Despite the broadening of her responsibilities, Acquire VP informed her that her transfer would not come with a promotion.

12. When Plaintiff expressed her surprise over the lateral nature of her transfer, Acquire VP apologetically explained that his manager, BDS CFO, had created the position with the intention of promoting a non-executive manager, a Caucasian, whom BDS CFO favored. However, Acquire VP assured Plaintiff that the position was so high profile and important that, as long as she met expectations, she was bound to be promoted. Acquire VP seemed confident that BDS CFO would approve the change; once Plaintiff became a BDS Finance employee, BDS CFO would accept that Plaintiff was a member of BDS CFO's own team.

13. Plaintiff hit the ground running in her new role and, within a quarter, she and her team began delivering on opportunities that Plaintiff had identified to increase CDA's

COMPLAINT - 4

WYATT GRONSKI
PLLC

ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

quarterly cash receipts. She also taught the Contracts managers on her team to spot other opportunities, whether they were situational (e.g., a customer that had funds they wanted to use before the end of a fiscal year) or relied on contract clauses that provided the authority for customers to pay Boeing for work as it was being performed. Plaintiff and her team were so successful in their efforts that CDA consistently beat its quarterly cash targets by wide margins—in some cases, by as much as one billion dollars—during Plaintiff's tenure as Acquire Director. The division also beat revenue and earnings targets in several quarters because Plaintiff and her teams worked hard to shorten the time it took them to submit and negotiate proposals, leading to dramatically faster awards of multi-billion-dollar contracts.

14. Plaintiff's accomplishments were regularly recognized by the VPs most familiar with her work, including CDA GM, CDA CFO, and Acquire VP. Some of her accomplishments were so material that they were highlighted as favorable developments in Boeing's quarterly earnings releases. The four male VPs who championed Plaintiff also periodically prodded BDS CEO and BDS CFO to join them in recognizing her, but their efforts were in vain. Although the VPs succeeded in ensuring that Plaintiff's annual performance scores were higher than the average of the scores she had received when she was an attorney, Plaintiff was not promoted and, on the rare occasions when BDS CEO or BDS CFO responded, they chose instead to recognize "the team" or shower their praise on a subordinate manager, none of whom were Asian.

15. Then, in early 2020, as COVID-19 began spreading in the United States and was accompanied by a rise in anti-Asian rhetoric and hate crimes, several of Plaintiff's colleagues, including her peers and subordinates, began to inform her of instances in

COMPLAINT - 5

WYATT GRONSKI
PLLC
ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

which BDS CFO had conspicuously omitted Plaintiff from her meeting invitations. Plaintiff also discovered that her supervisor, peers, and direct reports had been instructed by "BDS leadership" not to discuss with Plaintiff the work they were doing on a significant matter for which she had responsibility ("Secret Project"). The direction to exclude Plaintiff from any involvement in the Secret Project was apparently issued less than 24 hours after Plaintiff participated in a preliminary discussion of the Secret Project the morning of January 23, 2020. The following day, the Estimating Director for BDS called Plaintiff and asked her to help identify some estimators from Plaintiff's Puget Sound teams to work on a "hot" tasking that apparently involved briefings to Boeing's new CEO. After discussing the capabilities of various estimators, the two agreed to document their discussion in an email to Acquire VP. Shortly after they sent their email, Plaintiff received a call from the Estimating Director, who was rattled and confused because she had just been severely reprimanded by Acquire VP for discussing the "hot" assignment with Plaintiff. Plaintiff would later learn that the "hot" assignment was the same Secret Project that her boss and Contracts manager could not discuss with her. All the Contracts manager would say is that he had been asked to sign a non-disclosure agreement that prohibited him from discussing the Secret Project with Plaintiff. Although extraordinary measures were apparently put in place to prevent Plaintiff's from gaining any insight into the Secret Project from her boss and subordinates, these measures did not appear to have been extended to others outside of Plaintiff's immediate orbit. For example, Plaintiff was made aware of the Secret Project because other members of the CDA leadership team openly discussed the project and its status on weekly CDA leadership tag-up calls.

WYATT GRONSKI
PLLC
ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

16. In an especially glaring example of the campaign to marginalize, isolate, and humiliate Plaintiff because of her race, BDS CFO convened an in-person "diversity roundtable" during one of her visits to the Seattle area. The roundtable was held in the executive conference room across from Plaintiff's office and BDS CFO apparently invited every female BDS Finance manager in the region other than Plaintiff. Plaintiff only realized that she had missed an event with BDS CFO when she returned to her office after attending an off-site meeting and bumped into a large group of female colleagues as they were departing. These colleagues asked Plaintiff why she had missed such a rare opportunity to meet with a senior executive who held their professional fates in their hands. Plaintiff retreated to her office to hide the shock and humiliation she felt.

17. In other instances, Plaintiff was excluded from meetings in a manner that made her subordinates aware that she was being ostracized by BDS CFO. As an example, during each of the first two quarters of 2020, BDS CFO issued a virtual meeting invitation to one of the Contracts managers on Plaintiff's team. Each of the managers was unnerved by the invitations because they gave no indication of the subject of a meeting with an executive who was three levels above them while their own boss, Plaintiff, had not been included. The managers called Plaintiff for insight, but she had none to offer and was forced to call CDA CFO; his response was that he could not tell her the purpose of the meeting, only that the manager had nothing to fear, and she was forbidden from attending. The purpose of both meetings was for BDS CFO to inform each of the managers that he had been selected to receive an incentive grant as the top performer in BDS Finance for the immediately preceding quarter. Plaintiff was inexplicably barred from participating in the celebration of her employee's achievements even though she

COMPLAINT - 7

WYATT GRONSKI
PLLC
ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

had written the nomination that led to the first manager being recognized by BDS's leadership team in December 2019. Plaintiff had also written the nomination for the second manager to be awarded his grant.

18. Finally, after these managers and others expressed their discomfort over Plaintiff's exclusion from meetings and projects in her sphere of responsibility, Plaintiff raised these concerns in separate conversations with Acquire VP (her supervisor) and CDA CFO. These men reluctantly acknowledged that the failure to include Plaintiff on meeting invitations was intentional. They also confirmed that BDS CFO harbored an intense animus towards Plaintiff and that this animus was shared by BDS CEO. Both men praised her work, but one VP admitted that he was "very uncomfortable" with how she was being treated and, after she pressed him to explain the comment, blurted out, "all I can say is that you are the only Asian executive in BDS Finance." This comment echoed a comment from the same VP in December 2019, when he confided that he had helped prepare CDA GM to present Plaintiff as a high-potential executive at a BDS Talent Review Board meeting. The VP told Plaintiff that he had recommended that CDA GM raise the possibility that Plaintiff's career at Boeing had been stunted because of her race, referring to the virtual absence of East Asian executives within BDS.

19. After Acquire VP retired in mid-2020 and BDS CFO appointed another BDS division's Acquire Director to temporarily fill his role, Plaintiff experienced a dramatic escalation in the racial hostility directed at her by BDS Finance leaders and others. Plaintiff's Contracts managers regularly complained that her new manager and other BDS Finance executives were breaking normal company protocol by contacting them directly. Her new manager also began to conduct regular meetings with CDA's chief counsel and

COMPLAINT - 8

WYATT GRONSKI
PLLC
ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

attend CDA leadership meetings to which she had not been invited (she only knew about them because the chief counsel began forwarding the invitations to her). During these meetings, Plaintiff's new manager and the chief counsel would take turns publicly contradicting and challenging Plaintiff when she spoke. CDA CFO told Plaintiff that he and CDA GM were appalled with how Plaintiff was being treated and had counseled her harassers, in the strongest of terms, to cease and desist their coordinated campaign. Plaintiff's new manager also sidelined her from working on a high-profile negotiation with the U.S. Air Force on pending contracts for two production lots of KC-46 aircraft.

20. Plaintiff tried to ignore the hostility and focused her attention on areas of her work that were less likely to attract her manager's attention, including CDA's campaigns and programs with foreign customers. In mid-August of 2020, she requested her manager's approval for some time off so she could fly to the East Coast and spend a few days with her parents and sister, all of whom were battling cancer. When she returned from the trip, she informed CDA CFO that she was too weary and miserable after months of unrelenting harassment and verbal abuse from her manager, and others, and that she intended to accept the voluntary layoff invitation that had been issued to the vast majority of Finance executives while she was away. CDA CFO asked her to reconsider and told her to speak to CDA GM before making her final decision. He also confided that he and the other VPs who supported her had discussed her plight, concluded that she would never be able to overcome the BDS leaders' hostility towards her, and had reached out to executives at the corporate level and in other business units to find her a position outside BDS. Unfortunately, he said, they had concluded that it was not the right time for Plaintiff to make a move because the other business units were consumed in round after

COMPLAINT - 9

WYATT GRONSKI
PLLC
ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

round of layoffs that would also include the elimination of executive positions. CDA CFO acknowledged Plaintiff's distress but encouraged her to hang on while he and others tried to find her a new home.

21. Plaintiff ultimately declined the layoff offer but discovered the next day that every other BDS Acquire Director, including her temporary manager, had elected to be laid off, leaving Plaintiff as the only experienced Acquire Director remaining. As when BDS CFO appointed Acquire VP's temporary backfill, Plaintiff was not afforded an opportunity to apply for the vacancy because BDS CFO did not conduct an open hiring process. In November 2020, while Plaintiff was overseas on a mission to persuade a foreign customer to make large, business-critical cash payment before the end of the year, BDS CFO announced a reorganization that effectively eliminated the position and, along with it, another opportunity for Plaintiff to be promoted.

22. Nevertheless, in the face of a family crisis, including the death of her mother in November 2020, Plaintiff continued her stellar performance and, on December 30, 2020, months of hard work with her P-8 Contracts team paid off when the large payment was deposited in Boeing's account. With her temporary manager gone, Plaintiff was also free to resume working on U.S. Air Force programs. As the new year began, she filled in for her KC-46 Contracts manager so he could take additional time off, and personally led his team to complete negotiations that resulted in the awards of contracts on January 12 and 21, 2021 with a combined value of $3.8 billion. These awards were highlighted in Boeing's first quarter 2021 earnings release for their material contribution to improvements in BDS's performance that quarter.

COMPLAINT - 10

WYATT GRONSKI
PLLC
ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

23. In her final weeks at Boeing, Plaintiff raised several potentially serious compliance concerns to the attention of several executives, including CDA CFO and the P-8 Program's Program Manager and CFO. These communications are documented in numerous emails and text messages in which Plaintiff (i) repeatedly asked P-8's leadership to counsel an international sales manager and program manager who seemed determined to disclose technical information to a foreign customer despite export license provisos to the contrary, (ii) forwarded an email indicating that the technical information had been shared, and (iii) notified CDA CFO of a suspected breach of a customer's competition firewall by the same sales manager. In addition, in early February, Plaintiff voiced her objection to CDA CFO and P-8 CFO conducting transaction reviews of large P-8 proposals in a manner inconsistent with Boeing's internal controls. She reminded them that the Contracts function was charged with ensuring that transactions were duly authorized and to document the approvals in writing; she also reminded them that documentation of transaction approvals had been an area of focus in recent Sarbanes-Oxley audits.

24. Finally, on the evening of February 4, Plaintiff sent an email to CDA CFO requesting his approval to transmit an email to Boeing's Corporate VP for Contracts ("Corporate VP"). The email contained an analysis that Plaintiff, with the assistance of a member of her estimating team, had prepared to support Corporate VP in a discussion he planned to have with one of BDS's largest customers. The analysis leveraged macroeconomic trend data to model the hypothetical impact on BDS financials of a worst-case outcome to Corporate VP's discussions with the customer. CDA CFO instructed her not to send the email, but to schedule a call with the Corporate VP. Plaintiff attempted to schedule the

COMPLAINT - 11

WYATT GRONSKI
PLLC

ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

call, but as she was waiting for a response, she learned that CDA CFO had spoken to Corporate VP shortly after responding to her email.

25. She was still waiting for the meeting with Corporate VP to be confirmed when, on the morning of February 11, 2021, Plaintiff's was informed by CDA CFO and BDS CFO's human resources advisor that her employment with Boeing had been terminated with immediate effect. She had not received any prior notice. No explanation or cause for the termination was given and none of her questions seeking to understand the termination were answered. Plaintiff's summary of the compliance issues that she had raised in the months and weeks preceding the call was also met with silence.

26. Based on the discriminatory manner in which her employment was terminated (e.g., Plaintiff was given no notice and was not even offered half the benefits provided to non-Asian executives who were laid off at the same time) and other information revealed since her termination, it is clear that Plaintiff's termination was motivated by illegal animus towards her because of her Asian race and/or a misperception that her national origin is Chinese (Plaintiff's family background is Korean but Kang is also a Chinese surname). The termination was conducted without notice or any meaningful attempt to comply with Boeing's human resources policies and procedures in order to cut off Plaintiff's access to information and people outside BDS, just as she had been cut out of the Secret Project. Whether their aim was to prevent her from raising her compliance concerns, transmitting the analysis she asked CDA CFO to review and approve on February 4, 2021, or stop her from raising additional questions similar to the one she raised in the January 23, 2020 meeting she attended immediately prior to the erection of

COMPLAINT - 12

WYATT GRONSKI
PLLC

ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

the secrecy wall around the Secret Project, Plaintiff's termination was clearly wrongful and without legal basis.

27. Although all the documentation that Boeing sent Plaintiff after her termination has consistently characterized her termination as a layoff, she has been informed by a third party that Boeing had informed them that she had been fired. However, when the third party asked for an explanation, Boeing was unable to provide one, because, of course, there is none. Boeing has a well-documented employee corrective action process that requires, in the case of an executive, an investigation and a review by a panel that is required to include independent members before the corrective action can be taken. If any misconduct had been alleged against Plaintiff, Boeing's internal procedures would have required that she have been informed about it. The only purpose the classification of her termination as a firing serves is to damage Plaintiff's reputation, prevent her from being hired by Boeing as a contractor, and to obstruct her from seeking an equivalent position with another defense contractor.

28. After her employment was terminated, Plaintiff was told that BDS CFO posted a requisition that advertised Plaintiff's position at the more senior executive grade to which Plaintiff had been repeatedly denied promotion. In a recognition of the importance of Plaintiff's role, the Contracts portion of her job was eventually filled by two executives at the same grade as Plaintiff.

29. Plaintiff's treatment at Boeing, and her termination, caused her significant emotional distress and anxiety.

COMPLAINT - 13

WYATT GRONSKI
PLLC
ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

30. The discrimination Plaintiff experienced, both during her employment and in the extraordinarily targeted and vindictive manner in which her employment was terminated, has caused Plaintiff significant monetary losses.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION—UNLAWFUL DISCRIMINATION

31. Plaintiff realleges the previous paragraphs herein.

32. Boeing discharged Plaintiff and, during her employment, treated Plaintiff differently because of her Asian race and/or a misperception that she is of Chinese descent. These, and other adverse employment actions by Boeing, constitute direct discrimination against Plaintiff.

33. Boeing subjected Plaintiff to a severe and pervasive racially hostile work environment that materially affected the terms of Plaintiff's employment.

34. Boeing's direct discrimination, as well as subjecting Plaintiff to a hostile work environment, constitute violations of law, including RCW 49.60.180.

35. Boeing's actions caused Plaintiff damages in an amount to be proven at trial.

### SECOND CAUSE OF ACTION—WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

36. Plaintiff realleges the previous paragraphs herein.

37. Washington has well-settled and long-standing policies against racial discrimination and retaliation for raising concerns about compliance with laws, including export and securities laws.

COMPLAINT - 14

WYATT GRONSKI
PLLC

ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

38. Plaintiff engaged in conduct, including but not limited to reporting her discrimination to supervisors and raising issues regarding compliance with laws that promote Washington public policies.

39. Boeing dismissed Plaintiff because of Plaintiff's actions without any justification.

40. Boeing's actions caused Plaintiff damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION—RETALIATION

41. Plaintiff realleges the previous paragraphs herein.

42. Plaintiff engaged in protected activities at Boeing, including but not limited to complaining about her treatment by BDS leadership and raising issues concerning BDS's compliance with federal and state laws.

43. Boeing retaliated against Plaintiff for engaging in these protected activities.

44. Boeing's retaliation caused Plaintiff damages in an amount to be proven at trial.

### FOURTH CAUSE OF ACTION—BREACH OF CONTRACT

45. Plaintiff realleges the previous paragraphs herein.

46. By discriminating against Plaintiff, subjecting her to retaliation, and terminating her employment without even minimal efforts to follow policies and procedures governing dismissals of executives, Boeing breached its employment contract with Plaintiff, including but not limited to Boeing's obligations of good faith and fair dealing.

47. Boeing's breaches were material and caused Plaintiff damages in an amount to be proven at trial.

COMPLAINT - 15

WYATT GRONSKI
PLLC

ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for the following relief:

1. Judgment against Boeing for an amount to be proven at trial, but including (i) lost back pay, wages and benefits, (ii) lost front pay, future wages and benefits, (iii) pain and suffering including emotional upset, stress and anxiety.

2. Pre and post judgment interest on amounts awarded.

3. All attorneys' fees and costs incurred by Plaintiff.

4. For other relief as the Court deems just and equitable.

Dated this 9th day of February 2024.

WYATT GRONSKI PLLC

*Todd Wyatt*

Todd W. Wyatt, WSBA #31608
Attorney for Plaintiff

COMPLAINT - 16

WYATT GRONSKI
PLLC

ATTORNEYS
371 NE Gilman Blvd., Suite 260
Issaquah, WA 98027
425.395.7784